LOEWI & CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 36885. Filed December 15, 1954.

*Harvey W. Peters, Esq.*, for the petitioner.
*George T. Donoghue, Jr., Esq.*, for the respondent.

488

OPINION.

BRUCE, *Judge:* The instant transaction involves a broker, the petitioner, relieving its customer, Popp, of his obligations under certain when-issued contracts and personally assuming the rights and corresponding liabilities under the contracts in return for approximately $63,000 in securities. The when-issued contracts represented net commitments to purchase certain securities when, as, and if issued at a contract price which exceeded the then selling price of the securities on a when-issued basis by about $123,000.

Respondent determined that petitioner realized income on the transaction in the approximate amount of $63,000 by obtaining title to the securities which prior to that time had been deposited with petitioner as margin. Petitioner denies the realization of income and contends that the difference between the contract price and the then selling price of securities on a when-issued basis (about $123,000) minus the value of the securities received for assuming the liabilities under the contracts (about $63,000), or approximately $60,000, was deductible either as a bad debt loss under section 23 (k) (1) or as an ordinary loss presumably under section 23 (f) of the 1939 Code. We shall analyze the above contentions in the order named.

Respondent's contention that petitioner realized taxable income by acquiring title to the security deposit is without merit. Not infre-

quently the owner of when-issued contracts to purchase or sell will dispose of the contracts where there is an unrealized loss (e. g. purchase contracts where the contract price exceeds the present selling price of the securities on a when-issued basis) by paying the assignee a part of the amount of the paper loss for assuming the liabilities under the contracts. The September 18 contract in question was essentially an assignment of the customer's when-issued contracts to petitioner whereby petitioner assumed the customer's liabilities under the contracts in return for title to the customer's security deposits having a fair market value of approximately $63,000. Respondent would have us treat the receipt of the $63,000 as ordinary income because the off-setting liabilities were contingent. But in I. T. 3721, 1945 C. B. 164, 172, which was approved by this Court in *Raymond B. Haynes*, 17 T. C. 772, and *Morris Shanis*, 19 T. C. 641, it was ruled that the amount received for assuming the liabilities under a when-issued contract "is not taxable as ordinary income at the time of receipt, but is a factor to be taken into consideration in determining the ultimate gain or loss * * *."

It is contended that I. T. 3721, *supra*, is not controlling because it does not apply "to transactions entered into by dealers in securities where such transactions constitute a part of the business of dealers in securities." However, petitioner was not acting as a dealer; nor did it acquire the when-issued contracts for use in its dealer business. The contracts were acquired to be held as an investment, and the ruling is specifically "applicable to transactions entered into by investors." A dealer in securities can act as an investor (*Carl Marks & Co.*, 12 T. C. 1196; *Pacific Affiliate, Inc.*, 18 T. C. 1175, on appeal C. A. 9), and by special letter ruling dated August 18, 1950, I. T. 3721, *supra*, was held to apply to a corporate dealer in securities where when-issued contracts are acquired for investment purposes and not in conjunction with its business as a dealer in securities. Regardless of whether I. T. 3721, *supra*, is controlling, the rationale of the ruling appears applicable to the instant situation insofar as it relates to deferring the consideration of the amount received for assuming the liabilities under the contracts until the determination of the ultimate gain or loss. Cf. *Pacific Affiliate, Inc.*, *supra*. Such application negates respondent's contention.

Next we consider the merits of petitioner's contention that it sustained a deductible loss on the transaction in the year ended November 30, 1946.

The Commissioner determined that the taxpayer suffered no loss and this determination must be accepted as prima facie correct; and the burden is upon the taxpayer to establish not only the fact of his loss but the extent thereof. A

taxpayer who claims a deduction must not only point to the law which authorizes it, but must also present facts clearly bringing his claim within it. [*Early v. Atkinson*, (C. A. 4) 175 F. 2d 118, 121.]

Petitioner has not met this burden.

Clearly petitioner has not proven that it sustained a bad debt loss within the purview of section 23 (k) (1) of the 1939 Code.[1] To qualify under that section a taxpayer must show that a valid debt existed. *Charles S. Guggenheimer*, 8 T. C. 789. The customer's obligation to pay for the stock when and if issued did not constitute a debt. It was not an unconditional obligation to pay (*Lewis K. Walker*, 35 B. T. A. 640) which is a prerequisite to a bad debt loss. *Evans Clark*, 18 T. C. 780, affd. (C. A. 2) 205 F. 2d 353. Nor did the customer's obligation to deposit additional margin represent a debt.[2] An obligation to put up collateral is not an obligation to pay. Petitioner undoubtedly could have closed out the customer's account and held him liable for any loss sustained. Cf. Meyer, The Law of Stock Brokers and Stock Exchanges, secs. 30 and 146 (1931). Until that was done, however, no indebtedness arose and the amount of the prospective indebtedness could not be ascertained. Cf. *Henry* v. *Burnet*, 48 F. 2d 459. Furthermore, the taxpayer must prove the debt was worthless. The mere showing that the customer refused to supply additional collateral does not satisfy this requirement. Cf. *Henry* v. *Burnet*, *supra*. And, even if a debt had existed previously, after the customer was discharged from all obligations and liabilities under the September 18 contract, there was no debt to become worthless. *West Coast Securities Co.*, 14 T. C. 947; *First National Bank of Durant, Oklahoma*, 6 B. T. A. 545.

Petitioner is apparently contending in the alternative that it sustained an ordinary loss within the purview of section 23 (f) of the 1939 Code.[3] Sections 23 (f) and 23 (k) (1) are mutually exclusive (*Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182), but as

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\*     \*     \*     \*     \*     \*     \*

(k) BAD DEBTS.—

(1) GENERAL RULE.—Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. \* \* \*

[2] It is questionable whether the customer was obligated to "mark the market." Loss and Vernon, "When Issued Securities Trading in Law and Practice," 54 Yale L. J. 741, 753–754 (1945). Petitioner's demand for only $18,000 in additional margin on September 3, 1946, indicates that the customer's sole obligation was to maintain a 30 per cent margin on the net purchase price.

[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\*     \*     \*     \*     \*     \*     \*

(f) LOSSES BY CORPORATIONS.—In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.

we have held that there was no indebtedness and certainly none after the execution of the September 18 contract, this does not bar the deduction if petitioner in fact sustained a loss. *West Coast Securities Co., supra.*

Petitioner contends that it had sustained a loss on its brokerage contracts with its customer which was realized by entering into the September 18 contract. Petitioner admits that it acquired certain assets under the latter contract, but argues that the price paid was excessive. Petitioner contends that to the extent the price was excessive it cannot be considered as part of the basis, citing *Majestic Securities Corporation*, 42 B. T. A. 698, affd. (C. A. 8) 120 F. 2d 12, and *New Hampshire Fire Insurance Co.*, 2 T. C. 708, affd. (C. A. 1) 146 F. 2d 697, and, therefore, it must represent a loss.

There are two primary difficulties with petitioner's argument. The first is that petitioner has not shown to what extent, if any, the September 18 contract did not represent a purchase of the when-issued contracts and the security deposit by assuming the liabilities under the contracts. To the extent that assets were purchased, no loss is realized until the assets are sold. *W. L. Dunn*, 14 B. T. A. 13. Petitioner argues that by assuming the liabilities under the when-issued contracts it parted with more than it received. But as was pointed out in *Edgar M. Carnrick*, 21 B. T. A. 12, "An unfavorable purchase is not a realized loss." See also *W. L. Dunn, supra.*

Furthermore, we are not convinced that the bargain was as inequitable as petitioner contends. Petitioner could have sold the assets and sued the customer for any loss sustained. Instead it chose to keep the assets. Therefore, petitioner apparently either thought that a claim against the customer would be of little value or that the price paid for the assets by assuming the liabilities was not too far out of line. We are unwilling to adopt the former view which was not established by the record. Also the assignee of a when-issued contract would not normally receive the full amount of the paper loss for assuming the liabilities. Cf. I. T. 3721, *supra;* Loss and Vernon, 54 Yale L. J., *supra* footnote 2, at p. 761. Among factors to be considered are the assignee's right to retain the amount received even though he is never required to perform (I. T. 3721, *supra*) and his right to the income on the amount received until such time as the stock is issued even though said amount is deposited with the selling broker in marking the market. Loss and Vernon, 54 Yale L. J., *supra*, at p. 572. We, of course, are concerned primarily with the realities of the transaction and have not closed our eyes to the circumstances leading up to the September 18 contract. Undoubtedly the transaction represented, aside from a purchase, what appeared to petitioner to be the

best means of getting out of a possibly losing brokerage arrangement. But it does not necessarily follow from the fact that petitioner had a dual motive in purchasing the assets, that a part of the liabilities assumed represented a payment for something other than the purchase of assets.

The second difficulty with petitioner's argument is that even if the assets received did not fully compensate petitioner for assuming the liabilities, by merely taking over the when-issued contracts no loss was actually "sustained" within the purview of section 23 (f). The Supreme Court set forth the factors to be considered in determining when a loss is sustained in *Lucas* v. *American Code Co.*, 280 U. S. 445:

Generally speaking, the income tax law is concerned only with realized losses, as with realized gains. Weiss v. Wiener, 279 U. S. 333, 335. Exception is made, however, in the case of losses which are so reasonably certain in fact and ascertainable in amount as to justify their deduction, in certain circumstances, before they are absolutely realized. * * * no definite legal test is provided by the statute for the determination of the year in which the loss is to be deducted. The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal test. * * *

Petitioner, by taking over the when-issued contracts at a time when the contract price exceeded the selling price of the securities on a when-issued basis by about $123,000 in return for approximately $63,000 in securities, created a potential loss; but it was not a realized loss. Nor was the loss reasonably certain in fact; nor was it ascertainable in amount. For the most part, we have reached this conclusion, not because there was a possibility that the reorganization plans would not be approved and petitioner would not be required to perform, but because the amount of the loss, if any, which would be sustained by petitioner when, as, and if called upon to perform under the when-issued contracts, could not be ascertained. The value of the securities to be received under the contracts was subject to market fluctuations. A decline in the market value of the when-issued securities would increase the loss and a rise in the market would diminish it. As events transpired, due to a long range rise in the market, petitioner realized a gain on the transaction.

That the loss might have been fixed in the year ended November 30, 1946, is immaterial. Tax deductions are based upon what did happen and not upon what might have happened. If petitioner had closed out the customer's account and had compromised its claim for reimbursement for the loss sustained, petitioner would be in a different position. Cf. *West Coast Securities Co.; First National Bank of Durant, Oklahoma*, both *supra*. If petitioner had assigned the contracts to some third party who had assumed the obligations in return for petitioner's paying him or becoming obligated to pay him a fixed

amount, then as an accrual basis taxpayer petitioner might have been in a position to claim a deductible loss. But, instead of following a course of action which would have fixed its loss, petitioner chose to ride out the contract and let future market fluctuations determine the amount of its loss or gain. A taxpayer will not be permitted to gamble with the market beyond the close of the taxable year and say that he potentially sustained a loss within the taxable year. *Ewing-Thomas Converting Co.* v. *McCaughn*, (C. A. 3) 43 F. 2d 503.

Petitioner argues that the September 18 contract was an identifiable event which changed its status. Nevertheless the September 18 contract did not fix the amount of the loss, and not every identifiable event gives rise to a loss deduction. Also, a payment made to free oneself from a bothersome or unprofitable contract or relationship (cf. *Pressed Steel Car Co.*, 20 T. C. 198; Semmel and Stern, "Tax Effect of Form in the Acquisition of Assets," 63 Yale L. J., 765 (1954)) must be distinguished from the assumption of the rights and obligations under an executory contract in order to achieve the same end. In the former case the payment fixes the amount of the expense or loss. In the latter case, ordinarily, no fixed loss is sustained upon the assumption of the contract and the amount of the loss, if any, cannot be determined until the taxpayer disposes of the contract or is called upon to perform. Cf. *Ewing-Thomas Converting Co.* v. *McCaughn, supra.*

Petitioner has also stressed the fact that at the time of the September 18 contract it had deposited approximately $123,000 with the selling broker in marking the market. But making a deposit to cover the amount of a potential loss does not make it a realized loss. *Clark Dredging Co.* v. *Commissioner*, (C. A. 5) 63 F. 2d 527.

Petitioner also relies upon *Carl Marks & Co., supra,* for the proposition that it is entitled to take a loss deduction based upon market quotations where it changed its status with respect to the when-issued contracts from a broker to an investor. The *Carl Marks & Co.* case held that where securities are transferred by a dealer from inventory to an investment account, they acquire a basis equal to their fair market value at the time of the transfer. The fact that this treatment might result in an inventory loss to a dealer, who is otherwise entitled to a similar adjustment in using the lower of cost or market in computing its closing inventory, is no authority for allowing a loss deduction to a broker who acquires to hold as an investment its customer's when-issued contracts which have never been included in inventory.

Furthermore, no part of the liabilities assumed are deductible as an expense. No absolute payment was made, and the liability was contingent throughout the taxable year. Even though petitioner was an

accrual basis taxpayer, as the Supreme Court pointed out in *Brown* v. *Helvering*, 291 U. S. 193, "a liability does not accrue as long as it remains contingent."

*Decision will be entered under Rule 50.*